**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| **MARK ANTHONY MAXWELL,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )     **CAUSE NO. 1:15-cv-00280-SLC** |
| | ) |
| **COMMISSIONER OF SOCIAL** | ) |
| **SECURITY,** *sued as Nancy A. Berryhill,* | ) |
| *Commissioner of Social Security,*[1] | ) |
| | ) |
| **Defendant.** | ) |

## OPINION AND ORDER

Plaintiff Mark Anthony Maxwell appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").[2]  (DE 1).  For the following reasons, the Commissioner's decision will be REVERSED, and the case will be REMANDED for further proceedings in accordance with this Opinion and Order.

## I.  PROCEDURAL HISTORY

Maxwell applied for DIB and SSI in June 2014, alleging disability as of January 1, 2010, which he later amended to January 31, 2014.[3]  (DE 10, DE 18, & DE 35 Administrative Record

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security, *see Casey v. Berryhill*, 853 F.3d 322 (7th Cir. Jan. 30, 2017), and thus, she is automatically substituted for Carolyn W. Colvin in this case, *see* Fed. R. Civ. P. 25(d).

[2] All parties have consented to the Magistrate Judge.  (DE 14); *see* 28 U.S.C. § 636(c).

[3] Maxwell amended his alleged onset date after an administrative law judge issued him an unfavorable decision, which Maxwell did not challenge.  (AR 47, 106-16).

("AR") 270-82, 299). Maxwell was last insured for DIB on December 31, 2014 (AR 301), and thus, with respect to his DIB claim, he must establish that he was disabled as of that date. *See Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997) (explaining that with respect to a DIB claim, a claimant must establish that he was disabled as of his date last insured in order to recover DIB).

The Commissioner denied Maxwell's application initially and upon reconsideration. (AR 122-79). On March 26, 2015, a hearing was held before Administrative Law Judge William D. Pierson ("ALJ"), at which Maxwell, who was represented by counsel, and a vocational expert, Charles McBee (the "VE"), testified. (AR 45-102). On May 13, 2015, the ALJ rendered an unfavorable decision to Maxwell, concluding that he was not disabled because he was capable of performing a significant number of jobs in the economy despite the limitations caused by his impairments. (AR 12-39). The Appeals Council denied Maxwell's request for review (AR 1-6), at which point the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481.

Maxwell filed a complaint with this Court on September 30, 2015, seeking relief from the Commissioner's final decision. (DE 1). In this appeal, Maxwell contends that the ALJ: (1) improperly weighed the medical source opinions of record with respect to his need for an assistive device while ambulating; and (2) erred at step three by failing to analyze and conclude that he met or equaled Listing 12.05C, the intellectual disability listing.[4] (DE 22 at 11-20).

---

[4] Maxwell also initially argued that the ALJ erred when he relied on evidence that is not in the administrative transcript. (DE 22 at 10). However, Maxwell withdrew this argument in his reply brief, acknowledging that it was advanced in error. (DE 36 at 1-2).

## II.  FACTUAL BACKGROUND[5]

At the time of the ALJ's decision, Maxwell was 54 years old (AR 39, 270), and thus, is a person "closely approaching advanced age."  20 C.F.R. §§ 404.1563(d), 416.963(d).  He had completed high school[6] (AR 56, 313) and had work experience as a school janitor and a factory laborer (AR 303, 313, 373).

### A.  Maxwell's Testimony at the Hearing

At the hearing, Maxwell testified that he lives in a duplex owned by his mother; his mother and his son live downstairs.  (AR 51-52).  Maxwell has a girlfriend, but she has her own apartment; he sees her several times a week and every weekend.  (AR 51-53).  Maxwell drives a car, but he had not driven in several months because his medication makes him drowsy; his girlfriend had driven him to the hearing.  (AR 54-55).  In a typical day, Maxwell does not do much other than use the computer, lie around, and give his mother her medications.  (AR 80, 82).  His son or his girlfriend perform most of the household tasks, but he does help with dusting, wiping the table, vacuuming, and cleaning the bathroom.  (AR 80-82).  His sister comes over to cook meals every other day.  (AR 82).

When asked why he thought he could not work, Maxwell cited his back, kidneys, neck, feet, and knees.  (AR 65).  Maxwell stated that he suffers from back pain centered at his belt line and the pain sometimes causes numbness in his left leg.  (AR 70).  His back pain worsens if he does "too much" walking, standing, or cleaning, such as picking up clothing from the floor.  (AR

---

[5] In the interest of brevity, this Opinion recounts only the portions of the 2,283-page administrative record necessary to the decision.

[6] It is unclear whether Maxwell participated in special education classes.  Maxwell reported in several instances that he had (AR 313, 596), but his school system had no special education records for him (AR 386-88).

71-72).  He had a kidney removed several years earlier, and since then he has felt weak, tired, and unbalanced.  (AR 73, 76-77).  He stated that his fatigue and weakness keep him from performing many tasks; for example, he lies down to brush his teeth because he feels weak.  (AR 77).  Maxwell, however, is still able to shower independently.  (AR 77).

Maxwell also complained of "cramps" in his neck three or four times a day; he had told his doctors about the problem but had not received any treatment for it.  (AR 65-66, 72-73).  Additionally, Maxwell stated that his feet hurt if he stands too long; however, he had not received treatment for this condition either.  (AR 65-66, 71).  He reported that he has bilateral knee pain and that his left knee "goes numb" (AR 67); his knees worsen if he tries to stand too long (AR 71).  Maxwell stated that the pain in his feet and knees is constant, rating it as a "six" or "seven" on a 10-point scale without medication.  (AR 67, 69).  He added that he also has a tumor in his right shoulder that limits his lifting capacity.  (AR 75-76).

To help control his various complaints of pain, Maxwell takes pain medication and lies down about five to six hours a day to "stay off" his feet and knees and to help relieve his back pain.  (AR 64-65, 67-69).  He was prescribed a cane by his doctor after he injured his knee; he uses the cane when he goes out, but does not use it much at home.  (AR 64-65).  Maxwell estimated that he could stand for 15 minutes, walk for five minutes, sit for 20 minutes, and lift 10 pounds.  (AR 74, 92-93).

Maxwell complained of worsening depression, confiding that he thinks about suicide every day when he wakes up.  (AR 83-84).  He reported having three or four panic attacks a day.  (AR 56, 83).  He also complained of worsening problems with maintaining concentration and following directions.  (AR 89).  Maxwell takes Xanax for his panic attacks and his suicidal

thoughts; the Xanax helps to calm him down, but it does not prevent the attacks or suicidal thoughts. (AR 55-56, 85). Maxwell had been hospitalized for three days in February 2014 for his mental symptoms. (AR 84).

## B. Summary of the Relevant Medical Evidence

On June 17, 2010, Dr. Richard Jaskiewicz, a physician at the Veteran's Administration hospital ("VA"), treated Maxwell for a one-month history of right shoulder pain, which increased when sitting and decreased when lying down. (AR 1083). Dr. Jaskiewicz observed tenderness in Maxwell's right scapular region. (AR 1084). He diagnosed Maxwell with a right shoulder strain with spasms. (AR 1084). That same month, Mary Elias, a VA nurse practitioner, treated Maxwell for his right shoulder and low back pain. (AR 1072-73). Maxwell rated his shoulder pain as an "eight" on a 10-point scale. (AR 1072). Ms. Elias noted mild tenderness over Maxwell's superior right shoulder joint and spasms in the right upper trapezius and right cervical paraspinal muscles. (AR 1072-73).

In July 2010, Maxwell returned to Ms. Elias for his right shoulder and back pain. (AR 1052-53). He rated his shoulder pain as a "five" and his back pain as an "eight," stating that his back hurt mostly in the morning. (AR 1052). He was not working and was not doing any exercise. (AR 1052). He had a balanced antalgic gait, his right shoulder was limited in active abduction and rotation, and his strength was 5/5 in his extremities. (AR 1053). He was assigned diagnoses of chronic lumbar pain and right shoulder pain. (AR 1053).

About a year later, on June 9, 2011, Maxwell returned to Ms. Elias for low back pain, which he rated as a "four." (AR 1026). He stated that his pain was worse in the mornings, but improved with medication. (AR 1026). Ms. Elias indicated that Maxwell's low back pain was

"stable." (AR 1026).

On July 22, 2011, Maxwell went to the VA emergency room for swelling in his feet. (AR 1016-17). He was diagnosed with lower extremity swelling and elevated creatinine levels. (AR 1017). In a follow-up visit on August 9, 2011, to Melissa Baughman, a VA nurse practitioner, Maxwell denied any current swelling, but stated that his feet start to swell if he sits at a computer desk too long. (AR 1009). On September 19, 2011, Maxwell saw Joshua McChesney, another VA nurse practitioner, who indicated that Maxwell's low back pain was stable. (AR 994-1001). Maxwell rated his knee pain as a "four," stating that it was aggravated by walking or bending. (AR 999). An X-ray of his right knee showed normal osseous structures. (AR 640).

On October 28, 2011, Dr. Manoj Suryawala, a psychiatrist at the VA, saw Maxwell for a follow-up on his mental health. (AR 988). Maxwell reported that he was doing much better on his new medication, Zoloft. (AR 988). He stated that although he still feels a bit depressed at times, he had no more negative thoughts and was no longer crying. (AR 988). Overall, Maxwell was very satisfied with his current medications of Zoloft and Seroquel, and he reported no medication side effects. (AR 988). Dr. Suryawala diagnosed Maxwell with depression not otherwise specified and assigned him a Global Assessment of Functioning ("GAF") score of 65.[7]

_____

[7] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000). A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.* A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). And, a GAF score of 61 to 70 reflects some mild symptoms or some difficulty in social, occupational, or school functioning, but "generally functioning pretty well." *Id.*
        "The American Psychiatric Association no longer uses the GAF as a metric." *Spencer v. Colvin*, No. 13-cv-1487, 2015 WL 684545, at *17 n.5 (C.D. Ill. Feb. 17, 2015) (citing Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013)). However, several medical sources of record used GAF scores in

(AR 988).

In November 2011, Maxwell rated his low back pain as a "three." (AR 987). He was taking Vicodin to help control his pain. (AR 987).

On May 16, 2012, Maxwell was seen by Carole Kindler, a VA nurse practitioner. (AR 954). Maxwell stated that his pain medication was not helping his back or knee pain, which ranged from a "five" to a "10." (AR 954). An X-ray of Maxwell's lumbar spine revealed mild levoconvex scoliosis. (AR 639). A physical therapist instructed Maxwell on the use of a home TENS unit. (AR 950).

On October 3, 2012, Maxwell underwent a consultative physical examination by Dr. B.T. Onamusi. (AR 1300-02). Maxwell reported to Dr. Onamusi that he could sit without limitation, stand for 10 minutes, and walk one block, but that he could not bend or lift anything. (AR 1301). Dr. Onamusi observed Maxwell walk with a short-strided gait; he had difficulty transferring onto and off of the examining table. (AR 1302). He did not require an assistive device for ambulation or transfer. (AR 1302). Dr. Onamusi noted that Maxwell had exaggerated pain behaviors due to anticipated pain. (AR 1302). He diagnosed Maxwell with chronic neck, lower back, and foot pain, which was probably degenerative in nature; and frequent headaches with periods of incapacitation. (AR 1302). Dr. Onamusi opined that Maxwell "should be able to engage in sedentary level activities as defined by the Dictionary of Occupational Titles." (AR 1302).

On November 11, 2012, Kathryn Nicholson, a VA nurse practitioner, completed a disability benefits questionnaire for purposes of Maxwell's VA disability application concerning

---

assessing Maxwell, so they are relevant to the ALJ's decision. *See id.* (citing *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013)).

his flat-foot condition. (AR 441-52). The condition was mild and likely not caused by his military service. (AR 445). She noted that Maxwell had pain in his feet, which increased in the mornings to the point where he could barely walk. (AR 446). She indicated that he also had swelling in his feet caused by prolonged sitting. (AR 446). She observed increased pain upon manipulation of his feet, extreme tenderness of the plantar surface of both feet, and decreased longitudinal arch height. (AR 447-48). She noted that Maxwell did not use an assistive device as a normal mode of locomotion and that he did not use orthotic or prescription shoes. (AR 450, 452). She concluded that his flat-foot condition did not impair his ability to work. (AR 452). Ms. Nicholson completed a second disability questionnaire in January 2013, again related to Maxwell's mild flat-foot condition. (AR 907-10).

On November 16, 2012, Ayagogo Rettew, another VA nurse practitioner, saw Maxwell for complaints of chronic pain in his feet, knees, and back. (AR 913). Ms. Rettew diagnosed Maxwell with chronic low back pain and shoulder arthralgia. (AR 913). Maxwell asked Ms. Rettew for a cane "for steady gait support." (AR 913). She referred him to the VA physical therapy clinic. (AR 912). At the clinic, a physical therapist fitted Maxwell with a cane and instructed him in proper usage and safety precautions. (AR 912). Maxwell voiced his understanding of the instructions and demonstrated proper use of the cane back to the physical therapist. (AR 912).

On April 4, 2013, Maxwell was hospitalized overnight after sustaining a left tibial fracture. (AR 827). A CT scan of his left knee showed a comminuted lateral tibial plateau fracture with slight depression along the lateral posterior margin, as well as moderate joint effusion and tricompartment degenerative disc disease. (AR 570). Maxwell was unable to use

crutches, so he was prescribed a walker and wheelchair with an elevated leg rest.  (AR 828).

In September 2013, Maxwell returned to Ms. Rettew at the VA for continued pain in his left knee and lower back, which Maxwell described as not well-controlled.  (AR 808-12).  He described his back pain as aching, sharp, and shooting; the pain was aggravated by walking.  (AR 808).  Ms. Rettew reported that Maxwell had chronic pain with a recent exacerbation that radiated down his left leg, causing his leg to give out at times.  (AR 808-10).  Ms. Rettew noted that Maxwell slightly limps and ambulates with a cane; his gait was slow and steady.  (AR 811).  There was slight swelling in Maxwell's right knee.  (AR 811).  Maxwell's current pain medication was continued.  (AR 812).

On February 25, 2014, X-rays of Maxwell's lumbar spine revealed post-surgical changes in the left paraspinal region, and X-rays of his left knee showed degenerative changes with joint effusion.  (AR 569).

On March 25, 2014, Maxwell returned to Ms. Rettew for continued knee pain, which ranged from a "seven" to a "10" in intensity.  (AR 476).  Ms. Rettew noted that Maxwell's gait was slow and steady with his cane.  (AR 477).  Maxwell was diagnosed with degenerative changes with joint effusion.  (AR 479).

On August 2, 2014, Maxwell underwent a consultative physical examination by Dr. H.M. Bacchus at the request of the state agency.  (AR 395-97).  Dr. Bacchus observed some joint tenderness to palpation and with range of motion of the lumbar and cervical spine.  (AR 396).  He also noted that Maxwell had a slight limp on the left due to knee pain, unsteadiness in tandem walk, an inability to hop on the left, and that he could squat only one-third of the way down.  (AR 396).  Dr. Bacchus documented range of motion deficits in Maxwell's neck, lower back,

knees, hips, and left ankle, noting tenderness with palpation and range of motion of his left knee more than the right.  (AR 396).  Maxwell had a slower gait and did not feel comfortable ambulating without his assistive device.  (AR 396).  His muscle strength was 4/5 in his left lower extremity.  (AR 396).  Dr. Bacchus also noted that Maxwell had a flat affect and a mildly depressed mood.  (AR 397).  Dr. Bacchus indicated the following diagnoses:  hypertension, treated with medication; chronic neck pain; chronic low back pain; bilateral knee pain, left greater than right, status post left knee fracture six months prior; bilateral foot pain; headaches; depression and anxiety, treated; insomnia; recent diagnosis of diabetes mellitus, treated with Metformin; hyperlipidemia, treated with Simvastatin; and antalgic gait for which he was using a cane.  (AR 397).  Dr. Bacchus indicated that Maxwell had some general arthralgia and that his main issue appeared to be his left knee.  (AR 397).  Dr. Bacchus concluded that Maxwell had "some limitations in regard[] to continuous or prolonged standing and walking, squatting, bending, climbing and walking on uneven ground, and any kneeling or crawling."  (AR 397).

An X-ray of Maxwell's lumbar spine on August 18, 2014, showed minimal lumbar spondylosis, and an X-ray of his left knee showed mild degenerative disc disease.  (AR 589, 593).

Also on August 18, 2014, Maxwell underwent a mental status examination performed by Leslie Predina, Ph.D., at the request of the state agency.  (AR 595-600).  Dr. Predina administered the Wechsler Adult Intelligence Scale – Fourth Edition ("WAIS-IV") to Maxwell, the results of which revealed a full-scale IQ of 61, which was in the extremely low range.  (AR 595-96).  Dr. Predina indicated that Maxwell put forth a good effort in completing tasks and "the measure appeared to be a valid administration."  (AR 596).  Dr. Predina opined that Maxwell's

performance on the WAIS-IV was "consistent with his lifelong difficulties with learning" and that he "will likely struggle in all areas of cognitive functioning." (AR 597). She also administered the Wechsler Memory Scale – Fourth Edition ("WMS-IV"), and Maxwell scored in the extremely low to low-average range on that test. (AR 597). Dr. Predina opined that the results of the WMS-IV "suggest the presence of significant deficits with regard to his memory functioning." (AR 597). She diagnosed him with a major neurocognitive disorder due to multiple etiologies and a mild intellectual disability. (AR 598).

On August 20, 2014, Dr. M. Brill, a state agency physician, reviewed Maxwell's record and concluded that he could lift and carry 10 pounds frequently and 20 pounds occasionally; stand and walk for six hours in an eight-hour workday; sit for six hours in an eight-hour workday; and occasionally balance, stoop, kneel, crouch, crawl, and climb. (AR 128-29). When rating Maxwell's exertional limitations, Dr. Brill stated that a "medically required hand-held device is necessary for ambulation." (AR 128). Dr. Brill observed that Maxwell was prescribed a cane by a medical provider at the VA. (AR 128). Dr. Brill opined that Maxwell could perform unskilled light work. (AR 133). Dr. B. Whitley, another state agency physician, affirmed Dr. Brill's opinion on October 27, 2014. (AR 157-59).

On September 18, 2014, Maxwell returned to Ms. Rettew for his complaints of low back and knee pain. (AR 701). Ms. Rettew observed that Maxwell was ambulating with a cane. (AR 701). Upon examination, Ms. Rettew documented normal range of motion, a slow and steady gait with a cane, and tenderness upon bending. (AR 702). Her assessment included shoulder arthralgia and chronic low back pain. (AR 702).

On November 29, 2014, Dr. Kevin Bodkin saw Maxwell for pain management and

chronic low back pain.  (AR 680-82).  Dr. Bodkin recommended that Maxwell undergo an MRI and physical therapy and referred him to physiatry for injections in his shoulder and knee.  (AR 682).

On December 20, 2014, an X-ray of Maxwell's right shoulder showed mild acromioclavicular joint degenerative changes, and an X-ray of his left knee indicated mild degenerative changes.  (AR 1103-04).  An MRI of his lumbar spine showed a diffusely bulging disc with mild spinal canal stenosis at the L4-L5 level.  (AR 1102).

On February 6, 2015, Dr. Kyung Yoon, a VA physiatrist, saw Maxwell for a five-year history of low back pain, which worsened with any activity.  (AR 1109).  Dr. Yoon noted that Maxwell walked favoring his left leg, that he had poor forward flexion, that his hip rotation was moderately limited on the right and mildly limited on the left, and that hip flexion caused him low back pain.  (AR 1109).  Dr. Yoon also found that Maxwell had tight hamstrings, tenderness to the upper lumbar area, and difficulty rolling side to side and sit to stand.  (AR 1109).  Dr. Yoon diagnosed Maxwell with chronic low back pain related to degenerative joint disease of the lumbar spine.  (AR 1109).  He recommended that Maxwell lose weight and participate in physical therapy to stretch his low back and legs.[8]  (AR 1109).

---

[8] After the ALJ issued his opinion, Dr. Suseela Doravari, a VA physician, opined in December 2015 that Maxwell had a medically determinable physical and mental impairment that prevents him from engaging in substantial gainful activity in any field of work and that was expected to last or has lasted for a continuous period of 60 months.  (AR 1296).  However, Dr. Doravari's opinion was not before the ALJ at the time he issued his decision, and therefore, Dr. Doravari's opinion will not be considered for purposes of this review.  *See Diaz v. Chater*, 55 F.3d 300, 305 n.1 (7th Cir. 1995) (explaining that where the Appeals Council denied review of the ALJ's decision, the district court could consider only the evidence that was before the ALJ).

# III. ANALYSIS

## A. *The Law*

Under the Act, a claimant is entitled to DIB or SSI if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App'x 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[9] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted); 20 C.F.R. §§ 404.1520, 416.920. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (citation omitted). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* (citation omitted). The burden of

---

[9] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. §§ 404.1520(e), 416.920(e).

proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868 (citation omitted).

## B. The Commissioner's Final Decision

On May 13, 2015, the ALJ issued the decision that ultimately became the Commissioner's final decision. (AR 12-39). The ALJ noted at step one of the five-step analysis that Maxwell had not engaged in substantial gainful activity since his alleged onset date. (AR 15). At step two, the ALJ found that Maxwell had the following severe impairments: mild spinal canal stenosis at the L4-L5 level with minimal lumbar spondylosis, mild acromioclavicular degenerative joint disease in the right shoulder, mild bilateral pes planus, mild degenerative changes in the right and left knees, obesity, diabetes mellitus, chronic kidney disease with a prior nephrectomy, hypertension, depressive disorder, personality disorder, panic disorder, and a very recent diagnosis of mild intellectual disability. (AR 15).

At step three, the ALJ concluded that Maxwell did not have an impairment or combination of impairments severe enough to meet or equal a listing. (AR 17). Before proceeding to step four, the ALJ determined that Maxwell's symptom testimony was not fully credible (AR 21) and assigned the following RFC:

> [T]he claimant has the [RFC] to perform less than the full range of light work . . . . He can lift, carry, push and pull ten pounds frequently and twenty pounds occasionally and sit for six hours in an eight hour work day and stand and/or walk for six hours during an eight-hour work period. On an occasional basis, he can: kneel; crouch; crawl; balance; squat; use one to two flights of stairs/ramps that have rails; and bend/stoop in addition to what is required to sit. He cannot climb ladders, ropes, or scaffolds. The claimant retains the mental [RFC] to perform simple, routine and repetitive work tasks that are learned through short demonstration or within a period up to thirty days. He can maintain a level of concentration that is required to perform simple tasks, remember

simple work-like procedures, and make simple work-related
decisions.  As to social interactions, the claimant can interact with
supervisors, co-workers, and the public on a superficial basis
defined as casual and occasional contact with no prolonged
conversations, but conversations would still involve necessary
instruction.

(AR 20).

Based on this RFC and the VE's testimony, the Commissioner concluded at step four that

Maxwell was unable to perform any of his past relevant work.  (AR 37).  At step five, however,

the Commissioner found that there were a significant number of other light-exertional jobs in the

economy that Maxwell could perform, including hand packager, palletizer, and laundry folder.

(AR 38-39).  Accordingly, Maxwell's applications for DIB and SSI were denied.  (AR 39).

### C.  The ALJ's Consideration of the Medical Source Opinions Concerning Maxwell's Need for an Assistive Device While Ambulating Will Be Remanded

Maxwell argues that the ALJ improperly considered the medical opinions of record with

respect to his need for a cane while ambulating.  Maxwell's argument is persuasive, as the ALJ

ignored or overlooked important evidence when weighing the medical source opinions of record

with respect to his need for a cane, making the ALJ's reasoning difficult to trace.  *See Rohan v.

Chater*, 98 F.3d 966, 971 (7th Cir. 1996) (explaining that an ALJ must "sufficiently articulate his

assessment of the evidence to assure us that the ALJ considered the important evidence . . . [and

to enable] us to trace the path of the ALJ's reasoning" (alteration in original and citation

omitted)).

When discussing Maxwell's asserted need for a cane, the ALJ observed that a VA nurse

practitioner prescribed the cane in November 2012 in response to Maxwell's request for a cane

to help steady and support his gait; the ALJ further noted, however, that the nurse did not

document examination findings to support his need for a cane. (AR 21, 2254). The ALJ also considered the opinion of Ms. Nicholson dated November 2011, which indicated that Maxwell's flat-foot condition did not cause him to need an assistive device and did not prevent him from working. (AR 28, 452). Additionally, the ALJ discussed Dr. Onamusi's consultative examination in October 2012, in which he found that Maxwell was limited to sedentary work but "did not require an assistive device for ambulation or transfer." (AR 27, 1301-02).

After discussing this evidence, the ALJ concluded that there is "no documentation that the need for a cane meets the specific criteria for use and for a finding of medical necessity as set forth in Social Security Ruling 96-9p." (AR 21); *see* SSR 96-9p, 1996 WL 374180, at *7 (July 2, 1996) ("To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed . . . ."). The ALJ explained that "the exams/evaluations in October, November, and December 2012 appear unsupportive of [Maxwell's] request and alleged need for a cane" and that "the prescription was in response to the request." (AR 22). As such, the ALJ found the timing of Maxwell's request for a cane suspect, considering that his disability application had just been denied and his back, knees and feet problems dated back to 2010. (AR 21).

Later in his decision, when weighing the various medical opinions, the ALJ discussed the opinions of Dr. Bacchus and the state agency physicians, Drs. Brill and Whitley. Dr. Bacchus observed at an examination in August 2014 that Maxwell had a slower gait, that he used a cane all of the time, and that he did not feel comfortable ambulating without a cane. (AR 27-28, 395-96). Dr. Bacchus concluded that Maxwell had some limitations in continuous or prolonged

standing and walking, squatting, bending, climbing, kneeling, crawling, and walking on uneven

ground, which the ALJ viewed as suggestive of a limitation to sedentary work.  (AR 27-28, 397).

The ALJ also discussed the opinion of Dr. Brill dated August 2014, as affirmed by Dr. Whitley

in October 2014, finding that Maxwell could lift 10 pounds frequently and 20 pounds

occasionally; sit for six hours in an eight-hour workday; stand and walk for six hours in an eight-

hour workday; and occasionally balance, stoop, kneel, crouch, crawl, and climb.  (AR 28, 128-

29, 157-59).  In weighing the various medical opinions, the ALJ, rather confusingly:  (1) gave

Ms. Nicholson's opinion "some significant weight" (AR 28);[10] (2) gave "greater weight to Dr.

Onamusi's findings than his opinion" (AR 27); (3) gave "less weight to Dr. Bacchus'[s] findings

than Dr. Onamusi's findings" (AR 27); (4) gave "lesser weight . . . to Dr. Onamusi's and Dr.

Bacchus['s] opinions" (AR 27); and (5) gave "significant weight to [Dr. Brill's and Dr.

Whitley's] opinions" (AR 28).

> In assigning significant weight to the opinions of Drs. Brill and Whitley, the ALJ stated:
>
> The undersigned notes that both Dr. Brill and Dr. Whitley have special
> knowledge of the disability program and its evidentiary requirements, which adds
> to the reliability of their opinions.  They also reviewed the medical evidence,
> *including the claimant's use of a cane*.  This also weighs in favor of giving their
> determinations significant weight.

(AR 28 (emphasis added)).  Thus, the ALJ relied on, at least in significant part, the opinions of

Drs. Brill and Whitley when he assigned Maxwell a physical RFC for a reduced range of light

---

[10] The opinion of a nurse practitioner is considered an "other source" under the Social Security regulations, rather than an "acceptable medical source."  *See Turner v. Astrue*, 390 F. App'x 581, 586 (7th Cir. 2010); *Stewart v. Colvin*, No. 14-cv-1361, 2016 WL 81779, at *7 (C.D. Ill. Jan. 7, 2016); *Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1055 (E.D. Wis. 2005); 20 C.F.R. §§ 404.1513(d), 416.913(d); SSR 06-03p, 2006 WL 2329939, at *1-2 (Aug. 9, 2006).  Although information from an "other source" cannot establish the existence of a medically determinable impairment, it may be used "to show the severity of the individual's impairment(s) and how it affects the individual's ability to function."  SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006); *see Koschnitzke v. Barnhart*, 293 F. Supp. 2d 943, 950 (E.D. Wis. 2003).

work that did *not* include the use of a cane.  (AR 20).  In doing so, the ALJ explained that "the above discussion of the medical evidence of record does not support the claimant's need for a cane . . . or . . . limitations of function greater than those already reflected in the above noted [RFC]."  (AR 25).

But the ALJ overlooked important evidence when assessing Maxwell's need for a cane. Contrary to the ALJ's recitation of the evidence, Dr. Brill opined that Maxwell *did* need a cane. That is, when rating Maxwell's exertional limitations, Dr. Brill stated:  "A medically required hand-held device is necessary for ambulation."  (AR 128).  Dr. Whitley later affirmed this opinion.  (AR 157, 159).  The ALJ apparently overlooked or ignored this statement.  This statement is important evidence that contradicts the RFC assigned by the ALJ and the hypothetical questions posed to the VE at step five.[11]  *See Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014) ("[T]he ALJ may not analyze only the evidence supporting [his] ultimate conclusion while ignoring the evidence that undermines it." (collecting cases)); *Perkins v. Astrue*, 498 F. App'x 641, 632 (7th Cir. 2013) ("An ALJ may not ignore entire lines of contrary evidence or selectively consider medical reports." (citations omitted)); *Myles v. Astrue*, 582 F.3d 672, 676 (7th Cir. 2009) ("[T]he ALJ may not simply ignore evidence." (citation omitted)).

The ALJ's failure to address Dr. Brill's statement (as affirmed by Dr. Whitley) concerning Maxwell's need for a cane is not mere harmless error.  *See Shramek v. Apfel*, 226 F.3d 809, 814 (7th Cir. 2000) (explaining that harmless errors are those that do not ultimately impact the outcome of the determination).  To explain, the ALJ posed the following

---

[11] Nor does the Commissioner attempt to explain or qualify Dr. Brill's statement concerning Maxwell's use of an assistive device in its response brief.  Rather, the Commissioner fails to address Maxwell's argument concerning Dr. Brill's statement.  (*See* DE 32 at 10-11).

hypotheticals to the VE concerning the use of a cane:

> Q  Okay.  Now if I were to further find the individual is to require a cane for ambulating prolonged distances and upon uneven terrain, would that have an impact upon the ability to perform those representative occupations?

> A  Utilizing a cane?

> Q  Utilizing a cane for when walking for long distances and upon uneven terrain.

> A  Your [H]onor, at the light exertional level these occupations do require an individual to be able to stand and/or walk up to six hours out of the eight-hour workday.  They also generally would require an individual to bilaterally be able to use their hands at least frequently.

> Q  Okay.

> A  With that, your [H]onor, if an individual was utilizing a cane, at the unskilled level, light, in my opinion there would be a severe reduction in the number of occupations that would be available and therefore I believe that such an individual would be reduced to a different exertional level.

(AR 98-99).  Thus, the VE testified that if the use of a cane were incorporated as an additional limitation in the assigned RFC, the hypothetical individual could no longer perform light work and would instead be limited to sedentary work.  As such, the ALJ's failure to consider Dr. Brill's statement that Maxwell—who is 54 years old and thus is a person "closely approaching advanced age," 20 C.F.R. §§ 404.1563(d), 416.963(d)—medically required a cane for ambulation is material to the outcome in this case.  *See, e.g.*, *Gilley v. Colvin*, No. 1:14-cv-00202-JMS-TAB, 2014 WL 6065899, at *7-8 (S.D. Ind. Nov. 13, 2014) (remanding case where the ALJ failed to adequately address the medical evidence pertaining to the claimant's use of a cane and why she qualified for light work, rather than sedentary work, and what effect attaining the age of 50 would have on the disability analysis).

The ALJ did cite reasons in addition to the opinions of Drs. Brill and Whitley for

concluding that Maxwell does not medically require a cane and is capable of performing light work. (AR 28 ("[T]he above discussion of the medical evidence and the facts, inconsistencies, objective medical findings, gaps in treatment, diagnostic tests, findings of dependencies, findings of absence of objective evidence for pain, specific statements, etc., . . . tend to undermine the claimant's claim when considered in combination."). Having said that, these reasons do not sufficiently appease the Court's concern that the ALJ assigned "significant weight" to the opinions of Drs. Brill and Whitley rendered in late 2014, which were some of the most recent opinion evidence concerning Maxwell's physical condition. Much of the other opinion evidence cited by the ALJ—for example, the opinions of Ms. Nicholson and Dr. Onamusi—was dated in late 2012 more than a year prior to Maxwell's amended onset date of January 31, 2014.

Consequently, the ALJ's decision will be remanded so that the ALJ may reconsider the opinions of Drs. Brill and Whitley concerning Maxwell's need for a cane and the impact of these opinions on the RFC analysis.

### D. Upon Remand, the ALJ Should Also Analyze Whether Maxwell Meets or Equals Listing 12.05C

Maxwell also argues that the ALJ erred by failing to analyze whether he meets or equals Listing 12.05C, the intellectual disability listing. Because the ALJ failed to address the requirements of Listing 12.05C at step three, the ALJ should analyze this listing upon remand.

"The Listing describes impairments that are considered presumptively disabling when a claimant's impairments meet the specific criteria described in the Listing." *Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999) (citing 20 C.F.R. §§ 404.1525(a), 416.925(a)). Specifically, to meet Listing 12.05C, a claimant must show: (1) significantly subaverage intellectual functioning with deficits in adaptive functioning prior to age 22; (2) a valid verbal, performance, or full scale

IQ of 60 through 70; and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function. 20 C.F.R. Pt. 404, Subpt P, App. 1 § 12.05; *see Charette v. Astrue*, 508 F. App'x 551, 553 (7th Cir. 2013); *Adkins v. Astrue*, 226 F. App'x 600, 605 (7th Cir. 2007); *Novy v. Astrue*, 497 F.3d 708, 709 (7th Cir. 2007); *Anderson v. Astrue*, No. 4:10-cv-91, 2011 WL 4899990, at *5 (N.D. Ind. Oct. 14, 2011); *Smallwood v. Astrue*, No. 2:08 cv 85, 2009 WL 2475272, at *8 (N.D. Ind. Aug. 11, 2009). "In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (citations omitted); *see also Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006); *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003); *Scott v. Barnhart*, 297 F.3d 589, 595-96 (7th Cir. 2002).

Here, at step three, the ALJ grouped various mental listings together, stating: "The severity of the claimant's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of listings 12.02, 12.04, 12.05, or 12.06." (AR 18). Thus, the ALJ's consideration of whether Maxwell's impairments satisfied or equaled listing 12.05C was "perfunctory," as he failed at step three to provide "any explanation of why [Maxwell's intellectual] impairments are not severe enough to qualify as disabled within the meaning of the Act." *Allen v. Barnhart*, 408 F. Supp. 2d 598, 602 (N.D. Ill. 2006) (concluding that the ALJ's step-five analysis that the claimant was able to perform other work in the economy was "premature and inherently flawed because of the incomplete step three analysis"); *see Barnett*, 381 F.3d at 670 (reversing the ALJ's decision because the Court could not determine if the ALJ considered whether the claimant, who was not credible, had an impairment that equaled a listing). That is, he did not discuss at step three Maxwell's full-scale IQ score of 61, which is

relevant to the second element of the listing, or the fact that Maxwell has several other severe mental and physical impairments, which arguably satisfies the third element of the listing. *See Smith v. Colvin*, No. 13-c-306, 2014 WL 1271188, at *7 (E.D. Wis. Mar. 26, 2014) (explaining that an ALJ's finding of a "severe" additional physical or mental impairment at step two satisfies the third prong of Listing 12.05C).

Indeed, the ALJ does not launch into any discussion of Maxwell's intellectual limitations until *after* he rendered his step-three finding. (*See* Tr. 17-20, 35-36). Consequently, it is unclear from the ALJ's decision what impact, if any, this evidence had on his step-three determination. *Brindisi*, 315 F.3d at 786 ("[T]he ALJ's opinion is important not in its own right but because it tells us whether the ALJ has considered all the evidence, as the statute requires him to do." (quoting *Stephens v. Heckler*, 766 F.2d 284, 288 (7th Cir. 1985))). Thus, the ALJ's step-three finding concerning Maxwell's intellectual impairments is "devoid of any analysis that would enable meaningful judicial review" with respect to Listing 12.05C. *Id.* ("The omission of any discussion of [the claimant's] impairment in conjunction with the listings frustrates any attempt at judicial review . . . .").

As such, upon remand, the ALJ should properly analyze and adequately articulate at step three whether Maxwell meets or equals Listing 12.05C.[12] *See Vander Linden v. Astrue*, No. 09-C-534, 2010 WL 1417931, at *6-7 (E.D. Wis. Apr. 7, 2010) (remanding case where the ALJ did not reference Listing 12.05 and provided nothing more than a superficial analysis).

---

[12] Because a remand is warranted based on Maxwell's argument challenging the ALJ's consideration of the medical source opinions concerning his need for an assistive device while ambulating, the Court need not fully address his other arguments.

## IV.  CONCLUSION

For the foregoing reasons, the decision of the Commissioner is REVERSED, and the case is REMANDED for further proceedings in accordance with this Opinion and Order.  The Clerk is directed to enter a judgment in favor of Maxwell and against the Commissioner.

SO ORDERED.

Entered this 26th day of May 2017.

/s/ Susan Collins_____
Susan Collins,
United States Magistrate Judge